DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment entered by the Wood County Court of Common Pleas, following a jury verdict finding appellant guilty of kidnapping, robbery, and vandalism. Because we conclude that the trial court committed no *Page 2 
prejudicial error at trial, did not err in imposing separate sentences for the kidnapping convictions, and committed no plain error by imposing consecutive sentences, we affirm.
 {¶ 2} Appellant, Roland Nickelson, was originally indicted on three counts of kidnapping, a violation of R.C. 2905.01(A)(2); one count of robbery, a violation of R.C. 2911.02(A)(1); one count of aggravated robbery, a violation of R.C. 2911.01(A)(1), a first degree felony; one count of theft of drugs, a violation of R.C. 2913.02(A)(1)(B)(6); and one count of vandalism, a violation of R.C. 2909.05(B)(1)(b). Appellant pled not guilty to all counts, and began filing various discovery and other motions.
 {¶ 3} Approximately one month before trial, appellant informed the court that he wished to represent himself. After admonishment by the court, appellant initially agreed to proceed with his appointed counsel. On the first day of trial, however, appellant again said he wanted to represent himself. After reminding him of the previous warnings against self-representation, the court permitted appellant to proceed as lead counsel, with his appointed counsel remaining as "co-counsel."
 {¶ 4} The state presented the following evidence and testimony, relevant to the issues on appeal. Jenny Martin, a "charge" nurse at Harborside Health Care located in Wood County, Ohio, testified that on June 25, 2005, at approximately 1:30 a.m., two black males entered the facility through a side door. Both men were wearing baseball style caps, pulled down on their faces. One man was tall and thin and the other was a little shorter and heavier. Martin, who was on a work break, stopped the men just outside the door and briefly asked why they were at the facility. One man stated that they were *Page 3 
bringing lunch for someone, but neither man appeared to be carrying a lunch. Before entering the building, Martin called 911 to report the suspicious activity to the police.
 {¶ 5} Martin then followed the men into the building and down a hallway. She observed the thinner man, later identified as appellant, leap over the counter at the nurse's station and grab nurse's aide, Cindy Whitenack, by the front of her shirt. Another nurse, Janine Smothers, was also behind the desk. Martin again called 911 and told police that two armed men were robbing the facility. She said that appellant was wearing lensless wire rim glasses and a striped shirt with yellow on it. The second man was wearing a shirt and blue jeans, "tinged red."
 {¶ 6} Martin testified that later she saw the men shove a nurse into a resident's room. She said they then tried to leave through the side door, but an alarm prevented the door from opening immediately. When one of the men reached into his jacket, Martin became afraid and suggested an alternate exit through the front door. Appellant then seized Martin and said, "you know we'll kill you" and "you are going with us." Instead of using the front door, however, the men exited through the side door where they had originally entered. As the men were leaving with Martin, she grabbed onto a nearby railing to prevent them from taking her out of the building.
 {¶ 7} Martin then identified items found during an inventory of the vehicle appellant was riding in after the robbery: med room keys that unlocked drug cabinets, med room drawers which stored medications, and an Oxycontin box. She also identified drugs, patient cards, and drug envelopes which had been in the med room drug cart. *Page 4 
Finally, she identified appellant as the thinner man who had grabbed Whitenack and then herself when he was leaving the building. On cross-examination, she acknowledged that she had once been employed as a men's prison guard, and confirmed that appellant was, in fact, the man who had attempted to drag her out of the building.
 {¶ 8} Janine Smothers, a registered nurse, then testified that she was also on duty on the night of the robbery and was sitting behind the counter at the nurses' station next to Whitenack. Smothers said that Whitenack saw and questioned that someone was coming down the hallway. Before Smothers could get up to look, a man jumped on the counter and ordered Whitenack to kneel down on the floor. A second man, later identified as Archie Harris, then joined the first, and also ordered Smothers to "get down."
 {¶ 9} As Smothers was kneeling, one of the men demanded "the contingency," which is an alternate supply of medication kept on hand in case of shortages or late deliveries. Smothers told the men she had the key and that the contingency was located in the "med room." Smothers said she and the two men entered the nearby med room where she unlocked the cabinet with the contingency supply. One man said he wanted Percocet and Oxycontin. The men took some of the drugs from the cabinet and then Smothers directed them to a medication cart. At one man's demand, she placed narcotics into a zippered blue bag he was carrying. The man then said, "I want it all," and Smothers gave him the drugs from another cart.
 {¶ 10} As the men then tried to leave through a side door, they seized Smothers and said she was going with them. When Smothers refused, stating that she would not *Page 5 
leave the building, the man got angry and told her to go into a resident's room. Smothers stayed in the room until after the men left. Smothers described the man that jumped on the counter as thinner, and wearing a ball cap, glasses, and gloves. She said the second man was heavier. Smothers also identified several exhibits as items taken from Harborside: med cards, drugs, and keys. She further identified the zippered blue bag used by the men to contain the stolen drugs.
 {¶ 11} Cindy Whitenack, a nurse's aide at Harborside, also testified that on June 25, 2005, she was working the10:00 p.m. to 6:30 a.m. shift. She was sitting behind the counter of the nurses' station when a man in a yellow and black striped shirt came over the counter and grabbed her. She also thought he wore a hooded sweatshirt and wire-rimmed glasses. The man told her to "stay there" and asked, "Where are the keys?" She indicated to him that she was not a nurse, only an aide, and did not have any keys. The man then told her not to move and said, "Don't make me hurt you." He told her to get on her knees and she felt something placed against her head. Whitenack testified that she did not know what it was and had her head down and her eyes closed because she was afraid.
 {¶ 12} Whitenack said the man then began tearing the nearby med room apart, asking where the drugs were. Over by a sink, appellant grabbed a cabinet, which was empty and came apart. He again said to her, "Don't make me hurt you." The man told her to stay where she was and then left. Whitenack could not remember if another man was in the med room, or where Janine was after the men left. *Page 6 
 {¶ 13} Officer Edward Harger of the Perrysburg Township Police Department, testified that he and Officer Rachel Rinkowski, in a separate police cruiser, responded to Martin's initial 911 call and, en route, were notified that Harborside had just been robbed at gunpoint. Officer Rinkowski continued east on Route 795, as Officer Harger turned north on Oregon Road toward Harborside. Approximately three tenths of a mile from the road exiting Harborside, Officer Harger, with lights and sirens engaged, pulled his cruiser up behind a dark colored Mercury Cougar containing two black males in the front seat.
 {¶ 14} Instead of yielding to the police vehicle, however, the Cougar merged into the passing lane and began to accelerate. Harger then pursued the vehicle which traveled at speeds of 80 to 90 m.p.h. In front of a local community college, the driver of the Cougar attempted to make a U-turn in order to avoid a train. The driver lost control and, as the car headed for a fence, two men jumped out from the driver's side and fled on foot.
 {¶ 15} Harger said the driver was a black male, wearing light colored pants and a light blue or white shirt with a tan horizontal stripe. The second passenger was also a black male who wore a white tee-shirt and light colored pants, which "rode low," exposing green nylon material underneath. As the Cougar continued moving forward, a third man wearing a light colored shirt and jeans exited the passenger side of the vehicle, scaled a nearby fence, and fled. This man was later identified as Archie Harris.
 {¶ 16} After securing the suspect vehicle, Harger began to search the area for the suspects and retrieved a dark colored backpack containing several packages of narcotics matching the description of those stolen from Harborside. Harger then returned the *Page 7 
backpack to the suspects' vehicle which was later towed to the police station to be inventoried.
 {¶ 17} Township police Sergeant Robb Gates testified that during the vehicle inventory, the following items were recovered: a green duffel bag, two ball caps, a white t-shirt, keys from the nurses' station at Harborside, and the blue zippered bag found at the scene by Officer Harger. The green duffel bag contained narcotics which also matched the description of those stolen from Harborside.
 {¶ 18} Sergeant Matthew Meredith of the Ohio State Highway Patrol testified that when he arrived at the scene of the crash to assist the township police officers, the suspects had already fled. Sergeant Meredith searched the area near the college for the suspects and established a perimeter. During his search in a brushy area, Sergeant Meredith apprehended appellant wearing khaki pants. Police also apprehended Harris that night, but the third man from the vehicle was never caught. Sergeant Meredith transported Nickelson to the Perrysburg Township Police Department and turned him over to an officer there.
 {¶ 19} Archie Harris, co-defendant, testified that earlier on the evening of the robbery, he and appellant had just met and had gotten "high" for a couple hours. He said that appellant began talking about "getting a lick," meaning to do something such as robbery to make money. Harris said that he, appellant, and another man, "Tommy," got into a friend's car, and decided to drive to the nursing home. Harris testified that he and appellant walked into the nursing home to rob them of drugs that they could then sell, *Page 8 
such as Oxycontin and Percocet. He corroborated nurse Martin's testimony, stating that they asked for the "contingency" and put the drugs in a duffle bag. Harris also agreed that he and appellant had acted very aggressively toward the nurses during the robbery.
 {¶ 20} After getting the drugs, Harris said, when the men tried to exit the building through the back door, it would not open. Although one of the nurses told them to leave through the front door, the men refused, exiting the building through the door they had originally entered, and running across the "back yard" to the waiting vehicle. Harris stated that when they drove away from Harborside, the men could hear police sirens. He said the car ended up by some railroad tracks and the three men jumped out of the car. Harris stated that he hid in some bushes by the tracks, but was found and arrested by police.
 {¶ 21} Harris then identified a hat, found in the vehicle by police, as his own, and said appellant had worn glasses during the robbery. He also acknowledged that he was testifying against appellant as part of a plea agreement. Harris stated, however, that he had talked with detectives about the specifics of the robbery, even before a plea agreement was discussed.
 {¶ 22} Detective Jim Gross then testified that, shortly after being put into a cell, appellant was seen sitting on a flooding toilet with his hands between his legs. Appellant was moved to another cell and handcuffed to the door. Maintenance supervisor Dan Kervin was called to unstop the flooding toilet. Kervin testified that he removed a pair of *Page 9 
khaki pants and a pair of gloves from the pipes leading from the toilet to the sewage system.
 {¶ 23} At this point during the proceedings, during a break, a juror asked why appellant was not being represented by counsel. Appellant's handwritten note was sent in, stating that he had a conflict with counsel and felt it was "appropriate" to represent himself. The state then continued with its final four witnesses.
 {¶ 24} Michael Rosiak, a neighbor who resides behind Harborside, testified that the day after the robbery, he found ten to fifteen gray yellowish cellophane packages near a broken picket fence in his back yard. Keith Williamson, special agent for the Bureau of Crime Identification and Investigation ("BCI") then testified that he assisted police in processing the Cougar. He identified photographs taken during the inventory of the vehicle, showing: a white tee shirt; the red, white and blue "Sox" hat; a gray and white Detroit hat; some keys; a package of tablets; plastic trays with drug labels and patient names on them; a dark green backpack; and a blue backpack. He also identified photos showing multiple drug packets and medication tablets found inside the blue backpack, and the license tag of the Cougar.
 {¶ 25} Rosiak stated that he transported some items from the vehicle inventory to the BCI laboratory for testing, as well as sheets with latent fingerprints lifted from inside the vehicle. He acknowledged that he did not do any of the actual testing, and none of the fingerprints submitted were positively identified as appellant's. *Page 10 
 {¶ 26} Next, Todd Wharton, a forensic scientist and fingerprint technician, testified that after examining 14 partial latent fingerprints and 11 partial latent palm prints, he was unable to find a match to identify appellant or another suspect. Wharton did match four prints to a "Thomas Watkins."
 {¶ 27} Finally, Julie Cox, also a BCI forensic scientist, testified that she tested the inside band of the gray and white Detroit hat found in the Cougar, and found DNA which matched appellant's DNA. In addition, the parties stipulated that the drugs found in the vehicle and backpack were controlled substances and to the chain of custody for all evidence presented in court. The state then rested.
 {¶ 28} Appellant moved for acquittal pursuant to Crim.R. 29, which was denied. Ultimately, the jury found appellant guilty of three counts of kidnapping, one count of robbery, one count of theft of drugs and one count of vandalism. Conceding that robbery and theft of drugs were allied offenses of similar import, the state elected to go forward with sentencing on the robbery charge.
 {¶ 29} The trial court sentenced appellant to seven year prison terms for each of the three counts of kidnapping, in violation of R.C.2905.01(A)(2), second degree felonies; a seven year prison term for robbery, in violation of R.C. 2911.02(A)(1), a second degree felony; and an 11 month prison term for vandalism, in violation of R.C.2909.05(B)(1)(b), a fifth degree felony. All sentences were ordered to be served consecutively. *Page 11 
 {¶ 30} Appellant now argues the following four assignments of error:
 {¶ 31} "I. The trial court failed to obtain a waiver written or otherwise of appellant's right to counsel, as required by rule 44(c) of the Ohio Rules of Criminal Procedure, and appellant cannot be found to have knowingly, voluntarily or intelligently waived his right to counsel.
 {¶ 32} "II. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Constitution of the State of Ohio.
 {¶ 33} "III. Appellant's sentence violated his rights under theFifth Amendment to the United States Constitution, Article I, § 10 of the Ohio Constitution, and provisions of O.R.C. § 2941.25.
 {¶ 34} "IV. Appellant's consecutive and non-minimum sentences pursuant to O.R.C. §§ 2929.14 2929.19 are unconstitutional."
 I. {¶ 35} In his first assignment of error, appellant argues that the trial court erred in failing to obtain a valid waiver of counsel and allowing defendant to proceed pro se. Appellant essentially contends that this error constitutes a violation of his constitutional right to counsel guaranteed by the Sixth Amendment and Section 10, Article I, of the Ohio Constitution.
 {¶ 36} The right to assistance of counsel under the Sixth Amendment of the United States Constitution has been found to embody a "correlative right to dispense with a *Page 12 
lawyer's help." Adams v. United States ex rel McCann (1942),317 U.S. 269, 279. A defendant may "proceed to defend himself without counsel when he knowingly, and voluntarily, and intelligently elects to do so."State v. Gibson (1976), 45 Ohio St.2d 366, paragraph one of the syllabus, citing Faretta v. California (1975), 422 U.S. 806.
 {¶ 37} Crim.R. 44(A) states:
 {¶ 38} "Where a defendant charged with a serious offense is unable to obtain counsel, counsel shall be assigned to represent him at every stage of the proceedings from his initial appearance before a court through appeal as of right, unless the defendant, after being fully advised of his right to assigned counsel, knowingly, intelligently and voluntarily waives his right to counsel."
 {¶ 39} Although Crim.R. 44(C) expressly requires that waiver of counsel in serious offense cases to be in writing, where substantial compliance is demonstrated, the failure to obtain a written waiver is harmless error. State v. Martin, 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 39. Therefore, when a criminal defendant is charged with a serious offense, and "elects to proceed pro se, the trial court must demonstrate substantial compliance with Crim.R. 44(A) by making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel." Id., citing Gibson, supra, at paragraph two of the syllabus. A "serious offense" is any felony. Crim.R. 2(C).
 {¶ 40} To be valid, a defendant's waiver must be made with an understanding of "the nature of the charges against him, the range of allowable punishment, the possible *Page 13 
defenses, any mitigating circumstances, and the dangers of self-representation." Gibson, supra, at 377, citing Van Moltke v.Gillies (1948), 332 U.S. 708, 724. A trial court may determine that a defendant's waiver of counsel was knowingly and intelligently made, only after a "comprehensive examination of all the circumstances" surrounding the waiver. See Von Moltke, supra, at 724. A defendant's waiver of counsel may be "involuntary if he is forced to choose betweenincompetent counsel or appearing pro se." United States v. Taylor
(1999), 183 F.3d 1199, 1203. (Emphasis in original.)
 {¶ 41} Nevertheless, an indigent defendant is not entitled to the counsel of his choosing, but rather, only the right to competent, effective representation. See State v. Murphy (2001), 91 Ohio St.3d 516,523; State v. Cowans (1999), 87 Ohio St.3d 68, 72. Moreover, the right to counsel does not guarantee the defendant a meaningful relationship with counsel. See Morris v. Slappy (1983), 461 U.S. 1, 13-14; State v.Pruitt (1984), 18 Ohio App.3d 50, 57. Hostility, tension, or personal conflicts between an attorney and a client that do not interfere with the preparation or presentation of a competent defense are insufficient to justify a change in appointed counsel. See State v. Henness (1997),79 Ohio St.3d 53, 65-66.
 {¶ 42} Furthermore, "[m]erely because appointed counsel's trial tactics or approach may vary from that which appellant views as prudent is not sufficient to warrant the substitution of counsel." State v.Glasure (1999), 132 Ohio App.3d 227, 239. Thus, an indigent defendant is entitled to new counsel "only upon a showing of good cause, such as a conflict of interest, a complete breakdown in communication, or an *Page 14 
irreconcilable conflict which leads to an apparently unjust result."State v. Edsall (1996), 113 Ohio App.3d 337, 339. See, also, State v.Blankenship (1995), 102 Ohio App.3d 534, 558.
 {¶ 43} In the present case, the record shows that appellant never executed a written waiver of counsel. Therefore, we must determine whether the trial court substantially complied with Crim.R. 44.
 {¶ 44} At a pretrial hearing on January 9, 2006, appellant expressed dissatisfaction with his counsel, the fourth appointed attorney. During the pretrial, the record shows that the trial court spoke at length to appellant regarding his wish to represent himself. The court noted that two of the previous appointed attorneys had withdrawn on their own, and a third had been replaced at appellant's request. The court specifically discussed with appellant the serious nature of the offenses, the complex issues of procedure, and the evidence that would likely be presented against appellant at trial. In addition, because appellant was charged with violent crimes, the court informed him about his limited ability to approach witnesses and the jury.
 {¶ 45} In reference to his current attorney, appellant stated "we are in constant conflict. We just don't mesh well." According to appellant, his attorney had failed to contact or see him about the case and was not filing requested discovery motions or addressing his other concerns. Although appellant said he preferred to be represented by counsel, he wished to represent himself at trial because he felt his appointed attorney was *Page 15 
not properly representing him. Appellant acknowledged that he might have been "difficult" but that he either wanted new counsel, or, alternatively, to represent himself.
 {¶ 46} The court again responded, noting that various motions and requests had been filed by the previous attorneys, and that "discovery is rather voluminous in this case." The court then stated that the attorneys appointed, including his current counsel, were experienced and excellent criminal attorneys. The court denied appellant's request for new counsel, but said that, should appellant choose to represent himself, his current attorney would be appointed to act as standby counsel and legal advisor. Appellant agreed to think it over and make his decision within a day or two.
 {¶ 47} On January 12, 2006, appellant agreed to representation by his appointed counsel, but requested a continuance, which was granted. Trial was rescheduled for approximately one month later, February 8, 2006. On the first day of trial, however, appellant again stated that he wished to represent himself, but with his appointed attorney as co-counsel. The trial court again questioned and admonished appellant, reminding him of the prior extensive discussion regarding the perils of self-representation and the serious nature of the charges. Despite the court's warnings, appellant confirmed his desire to proceed as his own lead counsel. The court then proceeded with trial.
 {¶ 48} During trial, counsel's actions were limited to conducting voir dire and occasional legal consultation. Appellant primarily represented himself during the rest of trial, including opening arguments, cross-examination of witnesses, registering objections, and closing arguments. On the second day of trial, appellant responded to a *Page 16 
juror's question as to why appellant was not represented by an attorney. Appellant sent in a handwritten note which said, "Due to [a] conflict in trial strategy with the final attorney appointed by the courts, the defendant felt it appropriate to represent himself." Although not technically a signed, written waiver, this writing does establish appellant's continued desire for and understanding of self-representation.
 {¶ 49} In our view, the record indicates that appellant was aware of and understood the dangers of self-representation, the nature and seriousness of the charges against him, and the severity of possible penalties and potential effect on his liberty and life. We conclude, therefore, that the trial court substantially complied with the requirements of Civ.R. 44 and that appellant knowingly, voluntarily, and intelligently waived his constitutional right to counsel and elected to defend himself.
 {¶ 50} Accordingly, appellant's first assignment of error is not well-taken.
 II. {¶ 51} In his second assignment of error, defendant claims that his constitutional right to effective assistance of counsel was violated. Appellant argues that, prior to trial and the period of self-representation, his appointed counsel erred by verbally moving to withdraw a previously filed "Motion for Lineup."
 {¶ 52} In order to succeed on a claim of ineffective assistance of counsel appellant must prove that (1) counsel's performance fell below an objective standard of reasonableness and, additionally (2) prejudice arises from counsel's performance. State v. Bradley (1989),42 Ohio St.3d 136, 142, citing Strickland v. Washington (1984), *Page 17 466 U.S. 668, 687. Essentially, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, supra, at 143. Furthermore, "[j]udicial scrutiny of counsel's performance must be highly deferential." Strickland, supra, at 689. To succeed on a claim of ineffective assistance of counsel, the appellant must overcome the presumption that, "under the circumstances, the challenged action might be considered sound trial strategy." Id.
 {¶ 53} Generally, decisions regarding what stipulations should be made, what evidence is to be introduced, what objections should be made, and what pretrial motions should be filed, primarily involve trial strategy and tactics. See State v. Edwards (1997), 119 Ohio App.3d 106. To overcome the sound trial strategy presumption espoused inStrickland, the record must demonstrate that filing a particular motion was justified and the failure to file such motion precluded appellant from asserting violations of his constitutional rights. See State v.Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 208. A defendant has no constitutional right to a pretrial lineup. State v. Taylor (Nov. 19, 1987), 8th Dist. Nos. 53001, 53031, citing United States v.Ostertag (C.A.8, 1980), 619 F.2d 767; United States v. Estremera (C.A.2, 1976), 531 F.2d 1103; and United States v. McGhee (C.A.5, 1974),488 F.2d 781.
 {¶ 54} In this case, appellant's counsel originally filed the motion for pretrial lineup to assure that two of the nurses would not be able to identify him at trial solely because he was sitting as the defendant. The two nurses which would have been asked to *Page 18 
identify appellant in the lineup, however, could not and did not identify him in court. Jenny Martin, the nurse who had the most contact with and best view of the robbers, did identify appellant, both at a preliminary hearing and again in court. As a result, even if the lineup had been conducted, the witness testimony would have been the same.
 {¶ 55} Consequently, appellant has failed to establish that counsel's withdrawal of the motion for a pretrial lineup prejudiced his constitutional rights, or that, had such a motion been filed and granted, the outcome of the trial would have been different. Therefore, since appellant has not presented sufficient evidence to show that trial counsel's performance and actions were not reasonable trial strategy, his argument that he received ineffective assistance of counsel is without merit.
 {¶ 56} Accordingly, appellant's second assignment of error is not well-taken.
 III. {¶ 57} In his third assignment of error, appellant claims that his sentences for both the kidnapping and robbery convictions violate the Double Jeopardy Clauses of the both the federal and Ohio constitutions. Appellant further asserts that the simultaneous convictions violate provisions of R.C. 2941.25.
 {¶ 58} R.C. 2941.25 provides:
 {¶ 59} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one. *Page 19 
 {¶ 60} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 61} To determine whether a defendant's conduct constitutes two or more allied offenses of similar import under R.C. 2941.25, a trial court must apply a two part test. State v. Ranee (1999), 85 Ohio St.3d 632, paragraph three of the syllabus. First, the elements of the offenses must be compared in the abstract, that is, by the elements established by the General Assembly, and not based on the facts of each case. Id. at 638-639. This comparison must be done to determine whether the commission of one offense necessarily results in the commission of the other. Id. at 638. If the statutory elements do not align, the comparison ends and the offenses are considered dissimilar and multiple convictions are allowed. Id.
 {¶ 62} If the elements are found to be of similar import, then the second step of Ranee requires that a defendant may not be convicted of both offenses unless the offenses were committed separately or with a "separate animus." Id. The Supreme Court has defined "same animus" as the "same purpose, intent, or motive." State v. Blankenship,38 Ohio St.3d 116, at 119. An offender may not benefit from the protection provided by R.C. 2941.25(A) unless he or she shows "`that the prosecution has relied upon the same *Page 20 
conduct to support both offenses charged.'" State v. Cooper,104 Ohio St.3d 293, 2004-Ohio-6553, ¶ 17, quoting State v. Logan (1979),60 Ohio St.2d 126, 128.
 {¶ 63} Robbery and kidnapping are offenses of similar import.Logan, supra, at 130. Under the plain language of R.C. 2905.01, no movement is required to constitute the offense of kidnapping; restraint of the victim by force, threat, or deception is sufficient. Therefore, implicit within every robbery is a kidnapping. Id.
 {¶ 64} Nevertheless, under the second step of Rance, a defendant may be charged for both kidnapping and an underlying crime if a separate animus can be shown for each. Id. at paragraph (a) of the syllabus. A separate animus for kidnapping is demonstrated when the restraint is prolonged, the confinement is secretive or the movement is substantial. Id. Additionally, where the movement or restraint of the victim subjects the victim to a substantial increase in risk of harm, a separate animus is demonstrated. Id. at paragraph (b) of the syllabus. If the kidnapping offense is "merely incidental" to the other crime, however, there is no separate animus. State v. Fears, (1999), 86 Ohio St.3d 329, 344, citingLogan, supra, at the syllabus.
 {¶ 65} In this case, appellant was charged with both kidnapping and robbery, offenses of similar import. We conclude, however, that the three kidnappings were not merely incidental to the commission of the robbery.
 {¶ 66} In the kidnapping charge relating to Martin, testimony presented indicates that, after the theft of the drugs, she was dragged by the waist down a hallway, in an attempt to remove her from the premises. This action establishes significant movement *Page 21 
and restraint, indicating a separate purpose independent from the robbery. Consequently, there was sufficient evidence to establish a separate animus for the Martin kidnapping, and appellant's conviction for that crime did not merge with the robbery conviction.
 {¶ 67} In considering whether a separate animus existed for the Smothers kidnapping charge, testimony demonstrated that appellant said she would be leaving with the assailants and, upon refusal, was confined in a patient's room. Appellant's statement and the secretive confinement establish a purpose independent from the robbery. Therefore, we conclude that a separate animus also existed for the Smothers kidnapping conviction, and it should not have been merged with the robbery conviction.
 {¶ 68} The third kidnapping charge related to Whitenack requires the examination of all the details presented at trial. We agree that no evidence was presented to show any significant asportation or secretive confinement of Whitenack. Nevertheless, in his quest for drugs, and prior to the actual theft, appellant ordered her to kneel down and to not move. The testimony indicates that he verbally threatened her at least twice, saying, "Don't make me hurt you." In addition, something was placed against her head to frighten her and likely to give her the impression that appellant intended to injure or shoot her if she moved. This all took place while appellant and Harris were ransacking the med room and gathering drugs.
 {¶ 69} Therefore, although Whitenack was not moved or secretly confined, we conclude that, under the circumstances, her restraint was prolonged enough and the risk of harm threatened against her if she moved was substantial enough to demonstrate a *Page 22 
separate animus from the underlying robbery conviction. Thus, the Whitenack kidnapping conviction also should not have been merged with the robbery conviction for the purpose of sentencing.
 {¶ 70} Accordingly appellant's third assignment of error is not well-taken.
 IV. {¶ 71} In appellant's fourth assignment of error, he contends that the trial court's sentence violates the recent decisions of the United States Supreme Court regarding the enhancement of sentences pursuant to findings made by the court, rather than a jury.
 {¶ 72} Upon review, we find that this case is controlled by the Supreme Court of Ohio's decisions in State v. Foster, 109 Ohio St.3d. 1,2006-Ohio-856 and State v. Payne, 114 Ohio St.3d 502, 2007-Ohio-4642. See, also, State v. Baccus, 6th Dist. No. L-06-1310, 2007-Ohio-5991. InFoster, the court held that R.C. 2929.14(B) and 2929.19(B)(2) violate the Sixth Amendment to the United States Constitution, pursuant toBlakely v. Washington (2004), 542 U.S. 296, and Apprendi v. NewJersey (2000), 530 U.S. 466. Foster, supra, at paragraph one of the syllabus. Under Foster, cases were remanded for resentencing where the defendant had been sentenced under the unconstitutional statutory sections. Foster, supra, at ¶ 105.
 {¶ 73} Recently, however, the Supreme Court of Ohio revisited the issue of remand, clarifying its Foster decision. See State v.Payne, 114 Ohio St.3d 502, 2007-Ohio-4642. In Payne, although the appellant did not object to his post-Blakely sentence in the trial court, he appealed his sentence claiming a Sixth Amendment andBlakely *Page 23 
error. Payne, supra, at ¶ 5. Affirming the Tenth District Court of Appeal's decision that Payne had waived his right to appeal underBlakely, the Supreme Court of Ohio concluded that any defendant who fails to raise an objection in the trial court after sentencing which occurs post-Blakely, "forfeits" a claim on appeal for a Blakely error. See Payne, supra, at ¶ 13-14, relying on United States v. Booker (2005),543 U.S. 220. The court stated that such a claim could only be addressed under the "plain error" standard. Payne, supra, at ¶ 13.
 {¶ 74} In this case, appellant was sentenced in February 2006, well after the Blakely case was issued. Since appellant did not object at the time of sentencing, we must review appellant's fourth assignment of error under the "plain error" standard.
 {¶ 75} To prevail on a claim governed by the plain error standard, appellant must demonstrate that the trial outcome would have been clearly different but for the alleged errors. State v. Waddell (1996),75 Ohio St.3d 163, 166. Regarding Blakely claims, unless a defendant shows that the court would have imposed a different or more lenient sentence absent the Blakely error, no plain error occurred.Payne, supra, at ¶ 25.
 {¶ 76} In this case, the sentences imposed were all within the parameters of the statutory limits for each offense. Furthermore, even presuming a Blakely error existed, after review of the sentencing hearing, we cannot say that the trial court would have imposed a more lenient sentence. Therefore, we conclude that no plain error occurred and appellant's Blakely claim must fail.
 {¶ 77} Accordingly, appellant's fourth assignment of error is found not well-taken. *Page 24 
 {¶ 78} The judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
 Arlene Singer, J., William J. Skow, J., Thomas J. Osowik, J. CONCUR. *Page 1