[Cite as *State v. Helms*, 2010-Ohio-4872.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 08 MA 199 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| TARAN HELMS, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:  Criminal Appeal from Common Pleas
Court, Case No. 08 CR 382.

JUDGMENT:  Conviction Affirmed. Reversed in Part
and Remanded for Resentencing.

APPEARANCES:
For Plaintiff-Appellee:  Attorney Paul J. Gains
Prosecuting Attorney
Attorney Ralph M. Rivera
Assistant Prosecuting Attorney
21 W. Boardman St., 6th Floor
Youngstown, OH 44503

For Defendant-Appellant:  Attorney Gary Van Brocklin
P.O. Box 3537
Youngstown, OH 44513

JUDGES:
Hon. Mary DeGenaro
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: September 29, 2010

DeGenaro, J.

{¶1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs and their oral arguments before this court. Taran Helms appeals the September 29, 2008 decision of the Mahoning County Court of Common Pleas that sentenced Helms to a total of fifty years in prison, subsequent to a jury finding of guilty on counts of attempted murder, a first degree felony in violation of R.C. 2923.02(A) and R.C. 2903.02(A)(D); felonious assault, a second degree felony in violation of R.C. 2903.11(A)(2)(D); aggravated robbery, a first degree felony in violation of R.C. 2911.01(A)(1)(C); kidnapping, a first degree felony in violation of R.C. 2905.01(A)(2)(C), and accompanying firearm specifications, pursuant to R.C. 2941.145.

{¶2} On appeal, Helms argues that the trial court erroneously failed to merge his felonious assault conviction with the attempted murder conviction, his aggravated robbery conviction with the kidnapping conviction, as well as all of his firearm specifications. Helms contends that the trial court's denial of the motion to change venue constituted an abuse of discretion given the extensive pretrial publicity for his case. Finally, Helms argues that the trial court abused its discretion in denying Helms's motion for relief from prejudicial joinder and trying Helms together with his co-defendant, Hattie Gilbert. Upon, review Helms's arguments are meritorious in part and with respect to sentencing only.

{¶3} Pursuant to recent Ohio Supreme Court precedent, attempted murder in violation of R.C. 2903.02(A) and felonious assault in violation of R.C. 2903.11(A)(2) are allied offenses of similar import. We conclude that Helms did not commit the offenses of attempted murder and felonious assault with separate animus, and that the convictions must merge. Although aggravated robbery in violation of R.C. 2911.01(A)(1)(C) and kidnapping in violation of R.C. 2905.01(A)(2)(C) are allied offenses of similar import, we find that Helms committed the two offenses with separate animus, and that the trial court's decision not to merge the two offenses was proper. Helms committed all of the charged offenses as part of a continuous transaction within the same time, space and purpose, and thus the trial court was required to merge Helms's firearm specifications

instead of imposing them consecutively.

{¶4}  In Helms's assignment of error regarding venue, he has only presented evidence that there existed a great deal of pretrial publicity, which is not enough on its own to demonstrate that the denial of the motion to change venue was an abuse of discretion.  Moreover, there was no evidence presented that the jury panel was in fact tainted.  Finally, the trial court took the appropriate measures to redact Helms's identity from his co-defendant's confession, and thus the trial court did not abuse its discretion in denying Helms's motion for relief from prejudicial joinder.

{¶5}  Accordingly, the decision of the trial court is affirmed in part and reversed in part and remanded for further proceedings.  Specifically, all of Helms's convictions are affirmed, to the extent that merger is not required.  The firearm specifications must be merged pursuant to R.C. 2929.14(D)(1)(b).  Finally, the case must be remanded for a new sentencing hearing.  At resentencing, the State must elect which conviction, attempted murder or felonious assault, should merge into the other for sentencing purposes, pursuant to the authority of *Williams* and *Whitfield*, and the trial court should effect all mergers pursuant to the State's election.

### Facts and Procedural History

{¶6}  Taran Helms and Hattie Gilbert were indicted by a Mahoning County Grand Jury on counts of attempted murder, felonious assault, aggravated robbery, and kidnapping, as well as four accompanying firearm specifications.  The charges arose from an incident on March 24, 2008, when the victim, Joseph Kaluza, was robbed and shot while on the way to make a bank deposit for his employer, a Kentucky Fried Chicken restaurant.

{¶7}  On June 20, 2008, Helms filed a motion for relief from prejudicial joinder, arguing that the co-defendants' defenses may be antagonistic.  Helms also stated that Gilbert had confessed to the police regarding her involvement in the robbery, that Gilbert's confession inculpates Helms as she identified Helms as an accomplice, and that Gilbert's likely decision not to testify would present a Confrontation Clause problem for Helms.  On August 5, 2008, Helms re-filed this motion in a more abbreviated form, as the first motion

was struck due to its unreasonable length.  On August 28, 2008, the trial court denied Helms's motion on the condition that the State redact any indication of Helms's existence in any portion of Gilbert's statement that might be presented at trial.

{¶8}   Helms first filed a motion for change of venue on September 3, 2008, arguing that extensive pretrial publicity about the case necessitated a change of venue. Helms attached approximately 35 articles from newspaper and internet sources, ranging from lengthy detailed articles to single-line references, regarding the robbery, the investigation and legal proceedings, and the medical recovery of the victim.  Helms later supplemented his motion for change of venue, attaching a DVD of television news coverage of the incident.  Helms also filed a motion for sequestered individual voir dire regarding pretrial publicity.

{¶9}   During the hearing on the motions, the trial court stated that it would rule on the motion for change of venue after voir dire had been conducted.  The trial court initially denied, but later granted Helms's motion for sequestered individual voir dire regarding pretrial publicity.

{¶10}  The trial court began voir dire on September 8, 2008.  During the process, the trial court asked the prospective jurors whether any of them knew about the case through firsthand information, interactions within the community, or media coverage.  The trial court then conducted individual voir dire of all prospective jurors who had indicated any familiarity with the case.  The jury veniremen were asked about the extent of their knowledge about the case, and further asked whether they could set aside what they had heard and decide the case solely upon the evidence presented at trial.  Following this questioning, the trial court excused a number of veniremen who had formed fixed opinions due to pretrial publicity or who were otherwise unsuitable.

{¶11}  During a break in voir dire and out of the presence of any veniremen, counsel for defendant Gilbert informed the trial court that there was writing above a urinal in the men's second-floor restroom which read:  "Remember Joe Paluka [sic]," and "KFC," as well as a racial epithet directed at the defendants.  Counsel stated that he had used the same restroom the day before and did not see that writing.  The deputy stated

that they did not see this writing the night before, and assumed that someone must have written the message during that day of voir dire. The trial court brought the jury venire back in, and asked if any of the men had used the second-floor men's restroom that day. Of the three veniremen who indicated that they had used that restroom, two had not noticed anything written on the wall, and one had not noticed anything related to this case written on the wall. None of those three veniremen served on the jury panel for this case.

{¶12} Subsequent to the completion of voir dire, Helms renewed his motion for change of venue, and filed a supplemental memorandum in support of the motion. The trial court denied the motion.

{¶13} The joint trial for Helms and Gilbert commenced on September 15, 2008. Joseph Kaluza testified that he was a manager for a Kentucky Fried Chicken restaurant, and was generally responsible for driving the restaurant's deposits to the bank. While Kaluza was en route to the bank on March 24, 2008, a woman in another car decelerated suddenly in front of Kaluza, causing him to hit the rear end of her vehicle. Kaluza immediately called the police and the area manager for his restaurant. The woman, Gilbert, got out of her car and asked to use Kaluza's phone. After briefly using it, Gilbert returned the phone through Kaluza's open passenger window and returned to her car. Shortly thereafter, a man appeared on the driver's side of Kaluza's car, and shot Kaluza in the neck, instantly paralyzing him. The man, Helms, continued walking to Gilbert's car, motioned for her to leave, then returned to Kaluza's car and pushed it onto a side street in front of an abandoned house. Helms then looked in the car for the deposit bag, and once he had found the deposit bag, containing $300.00, he demanded to know where the rest of the money was and threatened to shoot Kaluza in the head. Kaluza testified that someone in a truck stopped and asked if Kaluza and Helms needed help, and Helms declined. Helms then hurriedly grabbed another bag in the car (which turned out to be trash) and ran off. Kaluza testified that Kimberly Helms, the defendant's mother, used to work at Kaluza's restaurant and knew the deposit procedure, but she was fired the prior spring for theft.

{¶14} Kandace Johnson testified that she lived in a house a short distance away

from where the incident occurred. Johnson stated that she saw the car accident occur, Gilbert exit her car, speak to Kaluza, and return to her car. Johnson saw Helms walk from a side street, Ravenwood, onto South Avenue, the main street where the accident occurred. Helms walked up to Kaluza's car, fired a shot into the car without breaking his stride, and continued walking up to Gilbert's car. Johnson saw Helms point for Gilbert to leave, which Gilbert did. Johnson saw Helms immediately return to Kaluza's car and start "fumbling around," by reaching into the car through the driver's side window. Johnson saw Helms push the car, turn the car off, fumble around a bit more, then pull the car off of South Avenue and onto a side street, Hilton. Johnson estimated that 90 seconds elapsed between the gunshot and the pushing of the car. Johnson saw Helms continue to look around in Kaluza's car on the front passenger's side. Johnson saw Helms run through a yard as tow-trucks arrived at the scene.

{¶15} Jeremy Vignon testified that he saw Kaluza in his car shortly after the accident had occurred. As he drove by, Vignon noticed that Kaluza was slumped over in his car and bleeding. Vignon decided to turn around, and got back to the scene as Helms was finishing pushing the car onto Hilton. Vignon asked Helms if he needed any help, and Helms responded that he only had a flat tire. Vignon drove off again, but noticed that the car did not have a flat tire, and called the police. Vignon circled around again, and when he returned to the scene, Helms was running through the yard and tow trucks were arriving.

{¶16} A variety of law enforcement officers testified regarding their investigation of the incident, including Detective Sergeant John Kelty, who testified that he interviewed Gilbert and later interviewed Helms, after Helms's wallet was found in Gilbert's car and Helms's mother's prior employment at the Kentucky Fried Chicken had been discovered. A variety of other witnesses testified in order to lay the foundation for the submission of evidence, including a video of the accident captured by a Western Reserve Transit Authority bus; items retrieved from the scene, including a spent shell casing, a gun, coat, cap, and mask; the Bureau of Crime Investigation's lab results, which found Helms's DNA on the gun, coat and mask; and items retrieved from Gilbert's car, including a box of

bullets and Helms's wallet.

{¶17} After the State rested its case in chief, defense counsel immediately rested. The jury was charged on September 18, 2008, and on the same day it returned a verdict of guilty against Helms on all four counts and firearm specifications. Helms filed a sentencing memorandum with the trial court, arguing for merger of Helms's convictions, and merger of the firearm specifications.

{¶18} On September 23, 2008, the trial court held a sentencing hearing, at which Kaluza provided a victim impact statement, both Helms and Gilbert addressed the trial court upon being given the opportunity, and the trial court considered Helms's argument that the convictions and firearm specifications should be merged. The trial court overruled Helms's merger request, outlined its statutory sentencing duties, and imposed maximum consecutive sentences for the four felony offenses and four firearm specifications, for a total of 50 years. The trial court filed a judgment entry of sentence further explaining the reasons for imposing unmerged, maximum consecutive sentences.

### Merger of Allied Offenses of Similar Import

{¶19} In his first of four assignments of error, Helms asserts:

{¶20} "The trial court committed reversible error when it sentenced Appellant Helms to multiple sentences for allied offenses of similar import committed with a single animus, in violation of Helm's rights under the Fifth, Sixth, and Fourteenth, Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. [sic]"

{¶21} Helms contends that the trial court subjected him to double jeopardy both in failing to merge his aggravated robbery and kidnapping charges into one conviction, and in failing to merge his attempted murder and felonious assault charges into one conviction.

{¶22} The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution prohibit a defendant from being "tried twice for the same offense." This prohibition applies both to successive prosecutions and cumulative punishments. *U.S. v. Dixon* (1993), 509 U.S. 688, 704, 113

S.Ct. 2849, 125 L.Ed.2d 556.

{¶23} Statutory guidance regarding merger for allied offenses of similar import is found in R.C. 2941.25, which reads:

{¶24} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶25} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶26} When reviewing the applicability of R.C. 2941.25 to multiple convictions, a two-step analysis is required. *State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, at ¶16, citing *State v. Blankenship* (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816, and *State v. Rance*, 85 Ohio St.3d 632, 636, 1999-Ohio-291, 710 N.E.2d. 699. First, a reviewing court should determine if the elements of the offenses, when viewed in the abstract, "correspond to such a degree that the commission of one crime will result in the commission of the other." *State v. Cabrales,* 118 Ohio St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, at ¶22 (internal citations omitted). If the elements of the offenses do not correspond to such a degree, the reviewing court's inquiry ends, and multiple convictions are permitted for the crimes of dissimilar import. *Rance* at 636.

{¶27} Second, if the elements of the offenses do correspond, the trial court may not convict the defendant of both offenses unless it finds that the defendant committed the offenses separately or in a way that involved a separate animus for each offense. *State v. Winn*, 121 Ohio St.3d 413, 2009-Ohio-1059, 905 N.E.2d 154, at ¶10; *Cabrales* at ¶14. This second step of the analysis requires a consideration of the specific facts of the case and the conduct of the defendant. *State v. Cooper*, 104 Ohio St.3d 293, 2004-Ohio-6553, 819 N.E.2d 657, at ¶17-20.

{¶28} Whether multiple offenses are allied offenses subject to merger is a

question of law. *State v. Taylor*, 7th Dist. No. 07 MA 115, 2009-Ohio-3334, at ¶19. See, also, *State v. Cox*, 4th Dist. No. 02CA751, 2003-Ohio-1935, at ¶5; *State v. Kent* (1980), 68 Ohio App.2d 151, 154, 22 O.O.3d 223, 428 N.E.2d 453. We review questions of law de novo, without deference to the trial court's determination. *State v. Carnes*, 7th Dist. No. 05 MA 231, 2007-Ohio-604, at ¶5.

### Aggravated Robbery and Kidnapping

{¶29} Helms contends that his kidnapping and aggravated robbery convictions should have been merged, as they are allied offenses of similar import, and because he committed the two offenses with a single animus.

{¶30} Helms's aggravated robbery conviction was pursuant to R.C. 2911.01(A)(1), which states:

{¶31} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶32} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

{¶33} Helms's conviction for kidnapping was pursuant to R.C. 2905.01(A)(2), which states, in pertinent part:

{¶34} "(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

{¶35} "(2) To facilitate the commission of any felony or flight thereafter[.]"

{¶36} The Ohio Supreme Court has decisively held that the crimes of aggravated robbery, in violation of R.C. 2911.01(A)(1), and kidnapping, in violation of R.C. 2905.01(A)(2) are allied offenses of similar import. *Winn*, supra, at syllabus. *Winn* noted that its conclusion was in keeping with thirty years of precedent. Id. at ¶22, citing *State v. Fears*, 86 Ohio St.3d 329, 344, 1999-Ohio-111, 715 N.E.2d 136; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 198, 15 OBR 311, 473 N.E.2d 264; *State v. Logan* (1979), 60 Ohio

St.2d 126, 130, 14 O.O.3d 373, 397 N.E.2d 1345. Thus, Helms's convictions for aggravated robbery and kidnapping are allied offenses of similar import under the first tier of the analysis. Helms's convictions for these two offenses must merge unless Helms committed the offenses separately or in a way that involved a separate animus for each offense.

{¶37} "Animus refers to the defendant's immediate criminal motive, intent or state of mind." *State v. Hooper,* 7th Dist. No. 03 CO 30, 2005-Ohio-7084, at ¶15, citing *State v. Blankenship* (1988), 38 Ohio St.3d 116, 119, 526 N.E.2d 816. When a kidnapping is committed during another crime, there exists no separate animus "[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime." *Logan*, supra, at syllabus. However, "where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," there is a separate animus as to each offense. Id. Additionally, a separate animus exists if the restraint or movement of the victim substantially increases the risk of harm to the victim. Id.

{¶38} Helms argues that the moving of Kaluza's car occurred before the robbery had been completed, the movement was necessary to complete the robbery, and the movement did not occur after the robbery or otherwise in excess of what was necessary in order to complete the robbery. The State argues that the offenses should not merge because the movement of Kaluza was substantial and not incidental to the robbery.

{¶39} According to the testimony of Kaluza and Johnson, Helms first shot Kaluza in the neck, immediately paralyzing him. Helms then walked away from Kaluza, spoke briefly with Gilbert, returned to Kaluza's car, briefly "fumbled around" in the car, and moved the car from the busier street to the residential street. Johnson stated that the time that elapsed between the shooting and the pushing of the car was approximately ninety seconds. Vignon estimated that the car had been moved approximately 300 feet. After the car had been moved, Helms continued to search in the car, and threatened to shoot Kaluza a second time. Helms ran away with the deposit bag once tow trucks arrived at the scene.

{¶40} In support of its argument, the State cites various cases in which the victim was restrained after the underlying robbery offense was completed. See, *State v. Nickelson*, 6th Dist. No. WD-06-023, 2007-Ohio-6367; *State v. Rodgers*, 10th Dist. No. 06AP-808, 2007-Ohio-1501; *State v. Hairston*, 10th Dist. No. 06AP-420, 2007-Ohio-143; *State v. Parker*, 7th Dist. No. 03-MA-190, 2005-Ohio-4888. In cases such as these, it is quite obvious that the restraint was not incidental to the robbery due to the timing of the offenses. They are distinguishable from the case at hand, as Helms moved Kaluza in the midst of committing the robbery offense, rather than afterward.

{¶41} Nonetheless, any restraint or asportation of a victim may constitute a separate offense if it was not necessary in order to complete the robbery offense. This court has previously held that the asportation of the victim was not incidental to a robbery when the defendant first ordered a victim to drive her car down the street, turn down another street, and then stop, before robbing her at gunpoint, *State v. Gore* (1999), 131 Ohio App.3d 197, 127, 129-130, 722 N.E.2d 125 (7th Dist.). And therefore convictions for aggravated robbery and kidnapping should not merge. Id. at 130. In an older Ohio Supreme Court case, the defendant was already in the process of robbing the victim when he decided to restrain her, in order to prevent her from using the phone, and then continued to rob her and commit other offenses. *State v. Reynolds*, 80 Ohio St.3d 670, 682, 1998-Ohio-171, 687 N.E.2d 1358. The Ohio Supreme Court found that the offenses were committed separately under these facts, and concluded that the offenses would not merge. Id. In both of these cases, the deciding factor was not necessarily the distance the victim was taken or the exact amount of time the victim was restrained, but was instead whether the kidnapping was more than merely incidental to the robbery.

{¶42} It would have been possible for Helms to have completed the robbery on the busier street, thus the additional action of moving the car was more than merely incidental to the robbery, and had a significance independent of the robbery offense. In accordance with our decision in *Gore*, Helms committed aggravated robbery with a separate animus from his commission of the kidnapping offense. The trial court's decision not to merge the two offenses was therefore proper, and this portion of Helms's first assignment of

error is meritless.

### Attempted Murder and Felonious Assault

{¶43} Helms next contends that the offenses of attempted murder and felonious assault, though not perfectly aligned in the strictest of textual comparisons, must merge where there was only one gunshot fired and one victim.

{¶44} To establish the elements of attempted murder, the State must prove that the defendant engaged in conduct that, if successful, would have resulted in purposely causing the death of another. R.C. 2903.02(A); R.C. 2923.02(A). To establish the elements of felonious assault, the State must prove that the defendant knowingly caused or attempted to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2).

{¶45} The State argues that we should follow the reasoning of various other Ohio districts, which have previously held that attempted murder and felonious assault are not allied offenses under the first tier of the merger analysis. However, the Ohio Supreme Court recently reviewed this very issue, and held that "[f]elonious assault as defined in R.C. 2903.11(A)(2) is an allied offense of attempted murder as defined in R.C. 2903.02(A) and 2923.02." *Williams*, supra, at paragraph two of the syllabus. Specifically, *Williams* stated:

{¶46} "In order to commit the offense of attempted murder as defined in R.C. 2903.02(A), one must engage in conduct that, if successful, would result in purposely causing the death of another; to commit felonious assault as defined in R.C. 2903.11(A)(2), one must cause or attempt to cause physical harm to another by means of a deadly weapon.

{¶47} "Considering these elements in the abstract, although they do not align exactly, when [the defendant] attempted to cause harm by means of a deadly weapon, he also engaged in conduct which, if successful, would have resulted in the death of the victim. Here, felonious assault as defined by R.C. 2903.11(A)(2) is an allied offense of attempted murder as defined in R.C. 2903.02(A) and 2923.02." Id. at ¶25-26.

{¶48} Pursuant to this authority, Helms's conviction for felonious assault, in

violation of R.C. 2903.11(A)(2), and his conviction for attempted murder, in violation of R.C. 2903.02(A) and R.C. 2923.02, are allied offenses of similar import when viewed in the abstract under the first tier of the merger analysis. However, the trial court may still have been able to render separate punishment for both convictions, under the second tier of the merger analysis, if Helms committed the offenses separately or with a separate animus.

{¶49} Helms argues that the two offenses must merge because the wounding of Kaluza with a single gunshot forms the basis for both convictions. The State stopped at the first tier of the merger analysis, and did not provide an animus argument for the offenses of felonious assault and attempted murder. At trial, the State's theory of the case appears to have been that Helms committed attempted murder by shooting point-blank at Kaluza, and committed felonious assault by injuring Kaluza with that shot. This theory of the case is based on prior views that attempted murder and felonious assault are not allied offenses under the first tier of the merger analysis. Now that *Williams* is the controlling law, the State's theory of the case does not support separate punishments for Helms's attempted murder and felonious assault convictions.

{¶50} Because only a minority of districts had previously continued to a second tier analysis of animus when looking at attempted murder and felonious assault, the case law is somewhat limited on the subject. Thus the following overview includes cases involving various types of assault and murder.

{¶51} A separate animus is generally not found if the infliction of injury cannot be differentiated into more than one "incident". *State v. Reid*, 2d Dist. No. 23409, 2010-Ohio-1686, at ¶40 (three gunshots, one of which hit the victim, lead to the death of the victim); *State v. Minifee*, 8th Dist. No. 91017, 2009-Ohio-3089, at ¶18-19, 113 (a series of gunshots, one of which hit the victim, lead to the death of the victim); *State v. Mills*, 5th Dist. No. 2007 AP 07 0039, 2009-Ohio-1849, at ¶228 (single incident of inflicting multiple head and neck injuries which were fatal); *State v. Lanier*, 1st Dist. No. C-080162, 2008-Ohio-6906, at ¶29-32 (defendant fired several shots at the victim until the victim yelled that he had been shot, then defendant fired several more shots until the gun jammed).

{¶52} Conversely, courts have found that a separate animus existed in cases where factors such as the passage of time, creation of a "substantial independent risk of harm," or the infliction of an independent additional injury would allow a trier of fact to reasonably conclude that separate offenses were committed. *State v. Roberts*, 180 Ohio App.3d 666, 2009-Ohio-298, 906 N.E.2d 1177, at ¶14 (3d. Dist.). See, also, *State v. Golson*, 8th Dist. No. 92443, 2010-Ohio-63 (two assaults, the second of which resulted in death, were separated by time and the defendant's departure from and return to the scene); *State v. Hines*, 8th Dist. No. 90125, 2008-Ohio-4236, at ¶47 (defendant shot the victim in an elevator, continued to try to shoot the victim after he had fallen, and later attempted to shoot the victim after following him outside the building); *State v. Wilson*, 2d Dist. No. 22120, 2008-Ohio-4130, at ¶43-44 (initial shooting attempt was interrupted by physical struggle and the victim's attempt to flee, and the shooting of the victim in the back as he fled, followed by further shooting, constituted a separate offense); *State v. Siller* (Oct. 25, 2000), 8th Dist. No. 75139 (in judgment on a motion to reopen: defendants first beat and robbed the victim, then bound her so tightly that they caused her additional severe injuries).

{¶53} Here, the gunshot fired by Helms is the act that caused physical harm to Kaluza, and it was also the act that, if successful, would have caused Kaluza's death. This cannot be differentiated into multiple incidents, and the record does not indicate that Helms inflicted any additional injury or created a substantial risk of harm that was independent from the single gunshot fired. We therefore conclude that Helms did not commit attempted murder and felonious assault separately or in a way that involved a separate animus for each offense.

{¶54} Contrary to the claims of the dissent, we cannot find that Helms committed a separate offense of felonious assault when he stated "Where's the rest of the money, or I'm gonna shoot you in the head" to Kaluza. To uphold a felonious assault conviction based on this threat would violate Helms's due process rights, because it does not constitute legally sufficient evidence to support a verdict.

{¶55} The dissent relies on *State v. Green* (1991), 58 Ohio St.3d 239, 569 N.E.2d

1038 to support its contention that the facts of Helms's case support a conviction for felonious assault. In *Green*, the prosecution presented evidence that the defendant had uttered a threat while pointing a loaded rifle, which the defendant had cocked, at a police officer. Id. at 239. The Ohio Supreme Court concluded that "[t]he *act of pointing a deadly weapon at another coupled with a threat*, which indicates an intention to use that weapon, is sufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2). (*State v. Brooks* [1989], 44 Ohio St.3d 185, 542 N.E.2d 636, syllabus, explained and followed.)." Id. at syllabus (emphasis added). The same conclusion was reached in *Brooks*, wherein the defendant pointed a handgun at a woman's face during an argument and stated that he would kill her. *Brooks* at 187.

**{¶56}** *Green* and *Brooks* require that in order for the evidence to be sufficient to support a felonious assault conviction, there must be evidence of the defendant pointing the weapon and uttering threatening words. In both *Green* and *Brooks*, the utterance of a threat only served to prove the defendant's intent while aiming a weapon at a person; the threat, in and of itself, did not constitute felonious assault. Both *Green* and *Brooks* are clearly distinguishable from the case at hand. There is no evidence in the record that Helms's threat was accompanied by any action involving his firearm.

**{¶57}** The crime of felonious assault under R.C. 2903.11(A)(2) requires that the accused knowingly cause or attempt to cause physical harm to another by means of a deadly weapon. In order to prove attempt in this context, the State had the burden of establishing that Helms had the criminal intent to physically harm Kaluza with his firearm, and that Helms's conduct constituted a substantial step in carrying out that intent. R.C. 2923.02; *State v. Group*, 98 Ohio St. 3d 248, 2002-Ohio-7247, 781 N.E.2d 980, at ¶95; *Green* at 240-241.

**{¶58}** A mere threat to cause physical harm, without proof of any accompanying overt act that corroborates the intent to carry out the physical harm, does not constitute an attempt to cause physical harm. See *State v. Robertson,* 8th Dist. No. 80910, 2002-Ohio-6814, at ¶12 ("a mere threat cannot constitute an assault. In order to be guilty of assault, the offender must at least cause or attempt to cause physical harm to another.");

*In re Bowers,* 11th Dist. No.2002-A-0010, 2002-Ohio-6913, at ¶28 ("evidence that appellant threatened to inflict physical harm is insufficient to prove the crime of assault."); *State v. Smith* (Jan. 26, 2000), 9th Dist. No. 98CA007168, at \*2, citing *State v. Clark* (June 27, 1991), 8th Dist. No. 58270 (discussing the distinction between aggravated menacing and felonious assault).

{¶59} Instead, when there is no evidence that an overt act accompanied the threat of physical harm, the threat itself could, at most, support a conviction for aggravated menacing. Pursuant to R.C. 2903.21(A), aggravated menacing is "knowingly caus[ing] another to believe that the offender will cause serious physical harm to the person \* \* \*." The crime of aggravated menacing does not require the prosecution to prove that the offender has the ability or intent to carry out the threat. *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019 (7th Dist.), at ¶27. The fundamental distinction between felonious assault and aggravated menacing is whether the defendant tried to actually harm the victim, or if he merely knowingly frightened the victim. *Smith* at \*3, citing *Brooks* at 192.

{¶60} After using a firearm to shoot Kaluza, Helms walked away to speak with his accomplice, pushed and steered Kaluza's car onto a side street through the driver side window, walked around the car and opened the passenger side door to look for the deposit bag. After finding and taking possession of the bag, Helms uttered the above threat. Specifically, Kaluza's testimony regarding the circumstances of that utterance, in its entirety, was as follows:

{¶61} "Q: After being at the house, you said that the shooter grabbed the bag. What happened next?

{¶62} "A: He thought there was more money.

{¶63} "Q: Why do you believe that?

{¶64} "A: Because he said, "Where's the rest of the money, or I'm gonna shoot you in the head."

{¶65} "Q: Was there anymore money in the car?

{¶66} "A: No.

{¶67} "Q:     What happened next?

{¶68} "A:     I recall somebody coming down the road asking if we were okay, and the shooter said 'yes.' * * *."

{¶69} The only other testimony relative to the interaction between Helms and Kaluza was from Officer Wilson who recounted what Kaluza told him after the shooting. And there was no testimony from Wilson that Helms pointed a weapon at Kaluza or threatened to shoot him. The State did not present any evidence where Helms's firearm was or what Helms was doing with it while Helms pushed the car and searched for the deposit bag.

{¶70} The above testimony is certainly sufficient evidence to support a conviction for aggravated menacing, pursuant to R.C. 2903.21(A), as Helms knowingly uttered the threat to cause Kaluza to believe that Helms would cause Kaluza serious physical harm. However, because the State only presented evidence that Helms threatened to shoot Kaluza a second time, the dissent's conclusion that Helms committed felonious assault, pursuant to R.C. 2903.11(A)(2), is based on legally insufficient evidence.

{¶71} The dissent avoids the insufficiency issue by inferring that Helms must have been committing some sort of overt act with the firearm while uttering the threat, because the firearm was used earlier to shoot Kaluza, and because the firearm was found near the scene. Neither *Green* nor *Brooks* supports making such an inference. In both cases there was testimony that the victim *saw* the defendant pointing the weapon while simultaneously *hearing* the defendant utter threatening words. In neither case did the court *infer* that the defendant had possession of a weapon as the dissent suggests would be sufficient here. Moreover, because the State did not provide any evidence regarding Helms's use of the firearm at the time of his threat, this Court could just as easily infer that the firearm was in the pocket of Helms's coat or pants, or that it had been flung into the yard 125 to 130 feet from Kaluza's vehicle where it was found by the police, given that Helms steering and pushing the car and searching for and taking the deposit bag would usually be done with two free hands. Had the State provided any evidence whatsoever regarding what Helms was doing with his firearm at the time of the threat, a conviction for

felonious assault potentially would have been able to stand. However, the State simply did not present evidence regarding that fact. Therefore, based upon these facts, a conviction for felonious assault is legally insufficient. Conversely, had the State charged Helms with aggravated menacing, based upon these facts, a conviction for that offense potentially could have been legally sufficient.

{¶72} It is a fundamental principle of appellate review that a reviewing court is not permitted to deviate from the record in order to resolve issues on appeal. *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, at paragraph one of the syllabus. The dissent's inference inserts new facts into the record and relieves the prosecution of its burden of proving all elements of felonious assault beyond a reasonable doubt. In order to preserve Helms's due process rights, we cannot make such an inference.

{¶73} Given all of the foregoing, we hold that the trial court erroneously failed to merge Helms's convictions for attempted murder and felonious assault for sentencing purposes. We cannot determine which one of the two convictions must be merged into the other. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, at ¶20-22. The State "retains the right to elect which allied offense to pursue on sentencing on a remand to the trial court after an appeal." Id. at ¶21. We must therefore remand the issue to the trial court for a new sentencing hearing wherein the State must elect to pursue either Helms's felonious assault conviction or his attempted murder conviction for sentencing purposes. Accordingly, this portion of Helms's first assignment of error is meritorious.

### Merger of Firearm Specifications

{¶74} In his second assignment of error, Helms asserts:

{¶75} "The trial court committed reversible error when it failed to merge all firearm specifications contained in the indictment in violation of O.R.C.2929.14 (D)(1)(b) and in violation of Helm's [sic] rights under the Fifth, Sixth, and Fourteenth, Amendments to the United States Constitution. [sic]"

{¶76} Helms contends that the trial court erroneously failed to merge his firearm

specifications, because his offenses were all committed with the single purpose of obtaining money from Kaluza.

{¶77} When a defendant has been convicted of a firearm specification pursuant to R.C. 2941.145, a trial court may impose a three year prison term for "having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing the firearm, indicating that the offender possessed the firearm, or using it to facilitate the offense." R.C. 2929.14(D)(1)(a)(ii). In a case of multiple felony convictions with multiple firearm specifications, a trial court is limited in its ability to impose consecutive sentences for the firearm specifications. "[A] court shall not impose more than one prison term on an offender under division (D)(1)(a) of this section for felonies committed as part of the same act or transaction." R.C. 2929.14(D)(1)(b).

{¶78} The Ohio Supreme Court has defined "transaction" to mean "a series of continuous acts bound together by time, space and purpose, and directed toward a single objective." *State v. Wills*, 69 Ohio St.3d 690, 691, 1994-Ohio-417, 635 N.E.2d 370. Although offenses may be separately punishable according to the merger analysis of R.C. 2941.25, they may still be part of the same transaction under the gun specification analysis, R.C. 2929.14(D)(1)(b). This is because the concept of "act or transaction" controlling gun specifications is different and much broader than the concept of "animus" controlling merger. See *State v. Moore*, 161 Ohio App.3d 778, 2005-Ohio-3311, 832 N.E.2d 85, at ¶42-46. Determining whether multiple crimes are part of the same act or transaction involves a determination of the defendant's overall criminal objectives, not the defendant's specific animus for each crime. *State v. Franklin*, 178 Ohio App.3d 460, 2008-Ohio-4811, 898 N.E.2d 990, at ¶20; *Moore* at ¶45. A defendant's objective does not change from single to multiple merely because a defendant commits acts that constitute multiple criminal offenses.

{¶79} The application of R.C. 2929.14(D)(1)(b) can involve a consideration of both law and fact. *Moore* at ¶36. Here, Helms does not take issue with the trial court's findings that Helms shot Kaluza, moved his vehicle, searched his vehicle, and absconded

with the KFC deposit bag. Helms only takes issue with the trial court's conclusion that each offense was committed with a separate objective. Because the issue raised on appeal is limited to the trial court's application of the law to the facts, we review the issue de novo. Id.

{¶80} Helms argues that his use of a firearm during the commission of attempted murder, felonious assault, kidnapping, and aggravated robbery constituted a single continuous transaction, because his overarching purpose during all of the offenses was to obtain Kaluza's deposit money. In support of his argument, Helms cites a number of cases, the most salient of which are *State v. Marshall*, 8th Dist. No. 87334, 2006-Ohio-6271, and *State v. Harris*, 7th Dist. No. 04 JE 44, 2006-Ohio-3520.

{¶81} In *Harris*, the defendant and a co-defendant planned to break into the victims' home and rob them. *Harris* at ¶5. The defendants forced their way into the victims' home and held three victims at gunpoint. Id. at ¶6. One of the victims attempted to subdue the defendant, and after their physical struggle, the defendant shot the victim and then fled. Id. This Court concluded that the defendant's firearm specifications may not be imposed consecutively, because the acts of the defendant, constituting offenses of burglary, felonious assault, kidnapping, murder, and robbery, "occurred at the same time, in the same location, and were directed to the same object," which was to take money from the victims. Id. at ¶133. Thus, although the defendants committed various criminal acts in the course of attempting to rob the victims, the robbery remained the overarching purpose of the acts.

{¶82} In *Marshall*, the defendant participated in the planning of a robbery of a deli, which resulted in the commission of multiple offenses, including robbery and murder, against multiple victims inside the store. *Marshall* at ¶2-7. Several co-defendants entered the deli, held everyone at gunpoint, shot a woman who attempted to run away, shot a cashier, attempted to shoot other customers, ransacked the store searching for money, and fled. Id. at ¶5. The trial court imposed four consecutive sentences for the gun specifications that accompanied convictions for three counts of aggravated robbery, aggravated burglary, and two counts of murder. Id. at ¶28, fn.1. The Eighth District

concluded that "the aggravated robberies, the aggravated burglary, and the two murders were part of the same transaction. They were a series of continuous acts bound together by time, space and purpose, and directed toward a single objective-to rob the store. Consequently, the trial court may sentence Marshall for only one three-year firearm specification." Id. at ¶32. Thus, as in *Harris*, although the defendants committed various criminal acts, some of which may or may not have been part of their original plan, the acts were all committed with the overarching purpose of committing a robbery.

**{¶83}** The State counters that the decision to impose consecutive sentences for Helms's firearm specifications is in accordance with *State v. Bunch*, 7th Dist. No. 02 CA 196, 2005-Ohio-3309, reversed in part on other grounds in *In re Ohio Criminal Sentencing Statutes Cases,* 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174. In *Bunch*, the defendant and a co-defendant robbed the victim at gun point, then after completing the robbery, they decided to force the victim into her car, drove for some distance to an isolated lot, then ordered her out of the car and repeatedly raped her. *Bunch* at ¶230-231. Bunch was convicted of three counts of rape, three counts of complicity to rape, kidnapping, aggravated robbery, conspiracy to aggravated robbery, menacing, and nine accompanying firearm specifications. Id. at ¶34. The trial court did not merge any of the firearm specifications. This Court reversed the decision of the trial court, concluding that Bunch committed all of the offenses with, at most, three separate objectives: robbery, then kidnapping, then rape. Id. at ¶230-232.

**{¶84}** The State seems to argue that Helms's initial objective was robbery when the car crash was staged, but his objective changed when he shot Kaluza, changed again when he decided to move Kaluza's car, and returned to the objective of robbery when he procured the deposit bag. The State thus argues that Helms's firearm specifications should not merge because Helms's objectives changed over the course of his actions, just as Bunch's objectives changed from robbery, to kidnapping, to rape.

**{¶85}** This case is distinguishable from *Bunch*, because the specific context of Bunch's crimes indicated that the objective of robbery was completed when the robbery was completed; then changed to kidnapping, which was completed when the parties

arrived at a different location; then changed to rape. Id. at ¶230-231. Thus, Bunch did not, for example, commit rape with the overarching purpose of robbing the victim, nor vice versa. Here, Helms shot Kaluza and moved his car, all with the overarching purpose of finding and taking Kaluza's deposit money, similar to the overarching purpose of robbing the victims in *Harris* and *Marshall*.

**{¶86}** Given the foregoing, we conclude that the trial court erred in sentencing Helms to consecutive three-year sentences for each firearm specification. Helms's actions of shooting Kaluza, moving his car 300 feet, and taking his money constituted a single transaction with the singular objective of robbing Kaluza. Thus, the trial court should have merged Helms's firearm specifications for the purposes of sentencing. Accordingly, Helms's second assignment of error is meritorious.

### Motion for Change of Venue

**{¶87}** In his third assignment of error, Helms asserts:

**{¶88}** "The trial court abused its discretion and denied Appellant Helms his right to a fair trial by an impartial jury when it overruled his motion for a change of venue, in violation of Helm's rights under the Fifth, Sixth, and Fourteenth, Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. [sic]"

**{¶89}** Helms argues that the extensive pretrial publicity of the case made the selection of an impartial jury impossible. A motion for change of venue is governed by Crim.R. 18(B), which provides that "the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." A trial court has broad discretion in its ruling on a motion for change of venue. See, also, *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶60; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶34. A reviewing court must therefore uphold the trial court's decision on the motion absent a clear showing of an abuse of discretion. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶38. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably.

*State v. Adams* (1980), 62 Ohio St.2d 151, 157-158, 16 O.O.3d 169, 404 N.E.2d 144.

**{¶90}** Helms argues that the pretrial publicity in this case is similar to that which occurred in *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. In *Sheppard*, the United States Supreme Court reversed the denial of Sheppard's habeas petition because the trial court failed to take precautions against "massive, pervasive" pretrial publicity, and failed to control the media's intermeddling and disruptions in the courtroom during trial. Id. at 335. In *Sheppard*, the community was "saturated" with pretrial publicity about the defendant's refusal to take a lie detector test, details about the investigation and opinions as to why the defendant was guilty, the defendant's affair with another woman and ensuing theories about the defendant's murder motive, as well as pictures of the defendant during pretrial proceedings, and events such as the coroner's pushing the defendant to re-enact the crime before a group of reporters, and a publicly broadcasted questioning of the defendant, during which defendant's counsel were prevented from participating. Id. at 338-342.

**{¶91}** During the trial, in *Sheppard*, the trial court allowed representatives of the media to dominate the seating area of the courtroom, allowed the media to photograph the jury on a daily basis, and did little to regulate their conduct. Id. at 343-345, 358-359. The trial court paid little heed to the jurors' pretrial media exposure, and did little to prevent the jurors' further exposure to media during trial. Id. at 347-349 359-362. Although the Supreme Court noted that trial court's failure to take precautions against the jury's exposure to enormous pretrial publicity was not enough alone to constitute a due process failure, they found that the trial court's subsequent acquiescence to the media's dominance of the courtroom and its subversion of the entire trial process required the reversal of Sheppard's habeas denial. Id. at 355-356, 363.

**{¶92}** In Helms's motion for change of venue, he attached approximately 35 articles from newspaper and internet sources regarding the case, ranging from lengthy detailed articles to single-line references. Earlier articles detail the occurrence of the crime, the investigation, the arrest of Helms and Gilbert, some information about Helms's criminal history, and the bond hearings for Helms and Gilbert. Almost all of the later

articles discuss the community support for the victim and fundraising for his medical bills. Additional articles towards the time of trial address pre-trial proceedings such as the defendants' further bond proceedings, and a motion to suppress defendants' statements for Miranda violations.

**{¶93}** In Helms's supplement to his motion for change of venue, he attached a DVD of television news coverage of the incident. A number of clips from the DVD have the appearance of footage from news agencies, but they do not have the kind of editing or voice-over narration that would indicate that the footage was actually aired on television. Thus there is no way to verify if many of the filmed items on this DVD were ever viewed by the public. However, there were also a number of clips that included news anchor commentary, which may lead one to assume that they were aired on television. Footage at the beginning of the DVD showed a video of the car crash as captured by the WRTA bus security camera. There were also interviews discussing what was witnessed at the time of the incident. The majority of the later video clips focus on support for the victim, fundraising for the victim's family, and updates on the victim's physical recovery and return home.

**{¶94}** Helms asserts that this extensive pre-trial media coverage of the case prevented his ability to secure a fair trial. However, the extent of media coverage in this case does not parallel the media dominance that occurred in *Sheppard.* The mere existence of pretrial publicity is not a basis for granting a change of venue. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶117. By itself, even pervasive adverse pretrial publicity "does not inevitably lead to an unfair trial." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶58, quoting *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683. The Ohio Supreme Court has repeatedly held that a "careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845 at ¶61, quoting *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710.

**{¶95}** In order to successfully claim that pretrial publicity has denied a defendant of a fair trial, he "must show that one or more jurors were actually biased." *Yarbrough* at ¶61, citing *State v. Treesh*, 90 Ohio St.3d 460, 464, 2001-Ohio-4, 739 N.E.2d 749. "Only in rare cases may prejudice be presumed." Id., citing *State v. Lundgren*, 73 Ohio St.3d 474, 479, 1995-Ohio-227, 653 N.E.2d 304, and *Nebraska Press Assn.*, supra, at 554.

**{¶96}** The record shows that the voir dire on pretrial publicity for this case was comprehensive, and constitutes almost two thirds of the 2333 page trial transcript. First, the trial court asked the prospective jurors whether any of them knew about the case through firsthand information, interactions within the community, or media coverage. Only five of the twelve impaneled jurors fell within this group, and the remaining seven who were eventually impaneled stated that they had no knowledge of the case. The trial court then conducted an extensive sequestered individual voir dire of all prospective jurors who had indicated any familiarity with the case. The jury veniremen were asked about the extent of their knowledge about the case, and further asked whether they could set aside what they had heard and decide the case solely upon the evidence presented at trial. Counsel was able to fully question the veniremen about exposure to pretrial publicity. Counsel was given the opportunity to move for the disqualification of any veniremen based on exposure or bias. Following this questioning, the trial court excused a number of veniremen who had formed fixed opinions due to pretrial publicity or were otherwise unsuitable.

**{¶97}** Of the five impaneled jurors who had indicated some prior knowledge of the case, none knew or recognized the names of the defendants. They could not name the victim, but four recognized his name when it was told to them. All five heard that the victim worked for or was a manager of a KFC restaurant, and that the victim had been critically injured. Juror 32 heard that there was a robbery and an attempted murder by shooting. He heard that a car crash had been involved, and that people had been arrested and accused of committing the crime. Juror 34 heard that there had been a robbery, but did not know how it occurred and did not know (prior to her service as a juror) whether anyone had been arrested for the crime. Juror 53 heard that a robbery had been

committed by a young man and woman, and that a car crash and weapon were used. She heard that a young man and woman had been arrested and accused of committing the crime. Juror 67 heard that there had been a shooting, and that two people had been arrested and accused of committing the crime. Juror 77 heard that there had been a robbery, but had no knowledge of the investigation or arrests of any suspects.

{¶98} All five of these jurors stated that they had not formed any opinion as to the guilt or innocence of the defendants, and could be fair and impartial to both sides. They all stated that they could set aside any information about the case that they had previously been exposed to, and would only take into consideration the evidence presented at trial. Counsel for Helms and counsel for his co-defendant passed on all five of these jurors for cause.

{¶99} Helms claims that the trial court's sole justification for denying the motion for change of venue was that the selected jurors stated that they would be able to be impartial, and argues that such an assumption is simply too unrealistic in this case. Helms notes that 70 of the veniremen reported knowledge of this case during voir dire, and that extreme bias was present somewhere in the jury pool, given the racial epithet regarding the defendants that was written on the men's bathroom wall at some point during the voir dire process. Such reprehensible conduct is troubling. However, veniremen with extensive knowledge of the case or bias were removed from the jury venire, and there was nothing in the record indicating that any of the impaneled jurors wrote or even observed the graffiti in the men's restroom. It appears that Helms has not provided any evidence from the record to imply that any one of the jurors who was in fact impaneled was "actually biased" as required by *Yarbrough*.

{¶100} Additionally, if the defense does not challenge any of the impaneled jurors for cause due to pretrial publicity, the absence of challenges indicates that the defense "was not particularly troubled by the jury's exposure to pretrial publicity." *McKnight*, supra, at ¶63, citing *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶52, and *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶37. Defense counsel made repeated arguments regarding the prejudicial effect of pretrial

publicity during the individual voir dire on the specific subject of publicity. But counsel made no such argument for the five jurors that were eventually selected, and passed those jurors when given the opportunity to object based on bias from knowledge of the case. This further undermines any presumptions of bias based upon these five jurors' prior knowledge of the case.

{¶101} The media's presence in this case was not so pervasive as to per se deny Helms a fair trial, and the comprehensive voir dire process resulted in no example of bias on the part of any juror who was actually impaneled. Accordingly, Helms's third assignment of error is meritless.

### Prejudicial Joinder

{¶102} In his fourth assignment of error, Helms asserts:

{¶103} "The trial court abused its discretion and denied Appellant his right to a fair trial when it denied Helm's motion for relief from prejudicial joinder in violation of Helm's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution. [sic]"

{¶104} Helms argues that the trial court's redaction of any reference to Helms in Gilbert's confession during their joint trial was rendered meaningless due to the pretrial publicity that Gilbert had identified Helms as her accomplice when Gilbert confessed.

{¶105} The joinder of codefendants is governed by R.C. 2945.13, which provides:

{¶106} "When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately."

{¶107} Generally, the law favors the joinder of codefendants at trial. "Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas* (1980), 61 Ohio St.2d 223, 225, 15 O.O.3d 234, 400 N.E.2d 401. See, also, *State v. Schaim*, 65 Ohio St.3d 51, 1992-Ohio-31, 600 N.E.2d 661. However, in some cases joinder may be

prejudicial to a defendant. If in fact it appears that a defendant is prejudiced by a joinder of multiple defendants, then the trial court must "grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.

{¶108} An appellate court reviews a trial court's decision on joinder for abuse of discretion. *State v. Bundy,* 7th Dist. No. 02 CA 211, 2005-Ohio-3310, at ¶55. Abuse of discretion connotes more than an error of law or fact; it implies that the trial court's judgment is arbitrary, unreasonable, or unconscionable. *Adams*, supra. If the alleged prejudice from joinder is too general and speculative, a reviewing court will not conclude that the trial court abused its discretion in denying a defendant's motion to sever. In order to determine whether a trial court's failure to sever was an abuse of discretion, "[t]he test is 'whether a joint trial is so manifestly prejudicial that the trial judge is required to exercise his or her discretion in only one way-by severing the trial. * * * A defendant must show clear, manifest and undue prejudice and violation of a substantive right resulting from failure to sever. * * * ' " *State v. Schiebel* (1990), 55 Ohio St.3d 71, 89, 564 N.E.2d 54, quoting *United States v. Castro* (C.A.9, 1989), 887 F.2d 988, 996.

{¶109} Helms cites *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, as support for his argument that joinder was prejudicial in this case given that Gilbert identified Helms in her confession and did not testify at trial. The Ohio Supreme Court has explained, " 'In *Bruton,* the Supreme Court held that in a joint trial of two defendants, a confession of one co-defendant who did not testify could not be admitted into evidence even with a limiting instruction that the confession could only be used against the confessing defendant. The rationale of *Bruton* was that the introduction of a potentially unreliable confession of one defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment.' " *State v. Moritz* (1980), 63 Ohio St.2d 150, 153, 17 O.O.3d 92, 407 N.E.2d 1268, quoting *United States v. Fleming* (C.A.7, 1979), 594 F.2d 598, 602.

{¶110} A solution to the confrontation issue presented by a codefendant's confession is the redaction of that confession statement so that it does not identify the

defendant, either directly or by implication. *Bunch*, supra, at ¶88, citing *Richardson v. Marsh* (1987), 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176, and *In re Watson* (1989), 47 Ohio St.3d 86, 91, 548 N.E.2d 210. Here, the State redacted Gilbert's statement so that no identification of or reference to Helms was made.

{¶111} Detective Lieutenant Milstead testified that Gilbert admitted to being involved in an automobile accident and to wearing a pink coat at the time, which involved no reference to Helms. Detective Sergeant Kelty gave a more detailed account of Gilbert's confession. The trial court provided an instruction both at the beginning of trial and immediately preceding Kelty's testimony that a statement by one defendant must not be considered for any purpose as evidence against the other defendant. Gilbert's statements, as described by Kelty, outlined her study of the restaurant's deposit activities, acquisition of a gun, purchase of bullets, staging of the car crash, and request to use the victim's phone, with no reference to the existence of another person.

{¶112} The next part of Kelty's testimony does at least make an oblique reference to the existence of another person:

{¶113} "Q: Did she say why it was her job to stage the accident?

{¶114} "A: So the robbery could be committed.

{¶115} "Q: At some point, did she indicate that she saw something happen behind her?

{¶116} "A: Yes.

{¶117} "Q: What did she say she saw?

{¶118} "A: She saw Mr. Kaluza, the victim, slump to the right of the vehicle, his head, and saw blood.

{¶119} "Q: Did she ever indicate to you that she heard a gun go off?

{¶120} "A: Yes.

{¶121} "Q: How did she know that this person behind her, his head was slumped, and there was blood?

{¶122} "A: She saw that through the rearview mirror of her vehicle that she was sitting in at the time.

**{¶123}** "Q: What did she do next?

**{¶124}** "A: She drove home.

**{¶125}** Although this testimony naturally implies that there is another person participating in the crime with Gilbert, there is nothing indicating that Helms was that other person. Moreover, Helms does not take issue with this testimony in his argument on appeal.

**{¶126}** Helms does not argue that Gilbert's confession was inadequately or improperly redacted, but argues that the redaction was rendered meaningless because the news media had reported that Gilbert had identified Helms as her accomplice. This argument speaks more to Helms's third assignment of error regarding pretrial publicity, than to the issue of joinder. As discussed in the third assignment of error, there was no evidence of juror bias caused by media coverage of the crime, arrest and pretrial. The five jurors who had some prior knowledge of the case did not disclose anything during voir dire that indicated that they knew of Gilbert's statement identifying Helms as her accomplice. It is not justifiable to presume that the jury nonetheless knew about Gilbert's identification of Helms.

**{¶127}** Because any mention of Gilbert's confession was limited to avoid any reference to Helms, no *Bruton* violation occurred. Helms has not presented any evidence of prejudice as a result of the joinder of codefendants at his trial. Helms's fourth assignment of error is therefore meritless.

### Conclusion

**{¶128}** Helms's assignments of error regarding venue and joinder are meritless. The trial court did not err in failing to merge Helms's kidnapping and aggravated robbery convictions. However, the trial court was required to merge Helms's attempted murder and felonious assault convictions for sentencing, because Helms committed the two offenses simultaneously, thus with the same animus. Further, because Helms's offenses were all committed with the objective of robbing the victim, the trial court was required to merge the gun specifications for the offenses.

**{¶129}** As borne out in our analysis regarding Helms's claims of improper venue

and joinder, which we have rejected unanimously, this is a notorious crime in Mahoning County. And this court reviews cases involving crimes as heinous as those here, and more so. That being said, we are bound by our judicial oath to uphold the constitution and laws of this nation and this state "without respect to persons." A prosecutor has the discretion to charge a defendant with as many offenses as the facts support. Once the prosecution has put on its case, it is the constitutional role of the appellate court to ensure that a defendant's conviction, no matter how heinous his or her conduct is, comports with the law. The constitutions and laws of this nation and this state demand this of judges. The citizens of this nation and this state expect this of judges. Were judges to do otherwise, the words "without respect to person" in our judicial oath become meaningless. And the protections of the constitutions and laws of this nation and this state all of us enjoy are diminished.

**{¶130}** Accordingly, the judgment of the trial court is affirmed in part, and reversed in part and remanded for further proceedings. Specifically, all of Helms's convictions are affirmed, to the extent that merger is not required. The firearm specifications must be merged pursuant to R.C. 2929.14(D)(1)(b). Finally, the case must be remanded for a new sentencing hearing. At resentencing, the State must elect which conviction, attempted murder or felonious assault, should merge into the other for sentencing purposes, pursuant to the authority of *Williams* and *Whitfield*, and the trial court shall effect all mergers pursuant to the State's election. All in accordance with the law and consistent with this Court's opinion.

Vukovich, P.J., concurs.

Waite, J., dissenting with dissenting opinion.

Waite, J., dissenting.

**{¶131}** I must dissent in part from the majority Opinion in this case. The defendant, Taran Helms, shot and robbed the manager of a Kentucky Fried Chicken restaurant, Joseph Kaluza, on South Avenue, paralyzing the victim. One of the issues on appeal is whether Appellant's attempted murder charge and a felonious assault charge should have been merged at sentencing. Although the majority Opinion is correct that the initial shooting of the victim constituted a single crime of attempted murder, the evidence in the record now before us indicates that the defendant committed the crime of felonious assault a short time after the initial shooting. Therefore, this separate crime is punishable by up to eight years in prison. The record reflects that immediately after the victim was shot the defendant spoke with his codefendant for a minute, then pushed the victim's car (with the victim in it) about 300 feet to a more secluded spot. The defendant then said to the victim: "Where's the rest of the money, or I'm gonna shoot you in the head." (Tr., p. 1569.) Police found a gun about 20 feet from the crime scene (Tr., p. 1759), and the victim had already been shot with the weapon when the felonious assault occurred. My review of the evidence in the record reveals an initial crime of attempted murder, a lapse of time of a few minutes, then a second crime consisting of felonious assault. Since there was evidence of two separate crimes of attempted murder and felonious assault apparent in the record in this case, there is no reason to merge the two sentences as set forth in the majority Opinion.

**{¶132}** Felonious assault is defined in R.C. 2903.11(A)(2) as follows:

**{¶133}** "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶134}** In *State v. Green* (1991), 58 Ohio St.3d 239, 569 N.E.2d 1038, the Ohio Supreme Court held: "The act of pointing a deadly weapon at another coupled with a threat, which indicates an intention to use such weapon, is sufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2). (*State v. Brooks* [1989], 44 Ohio St.3d 185, 542 N.E.2d 636, syllabus, explained and followed.)" Id. at syllabus.

**{¶135}** Because felonious assault may be committed without discharging a firearm, as long as there is some type of threat indicating the intent to use the weapon, the evidence supports the jury verdict convicting Appellant of felonious assault. Although the prosecutor's theory of the case did not precisely explain the distinction between the attempted murder charge and the felonious assault charge in the manner I find apparent in this record, we are not charged with reviewing the prosecutor's theory of the case. We review the actual evidence presented to the jury as reflected in the record. There is no doubt that the defendant had a weapon, was willing to use the weapon, did use the weapon to shoot the victim in the neck, and threatened to shoot the victim in the head with the weapon to kill him. All this took place approximately two minutes after the initial shooting, and a sufficient variety of events intervened in those two minutes to clearly differentiate the second crime of felonious assault from the initial shooting. The initial shooting occurred without warning or threat. After the shooting, the defendant spoke with the codefendant, rummaged around in the victim's car, and pushed the car about 300 feet

to a secluded side street. Then the defendant threatened to shoot the victim in the head. Although the victim did not specifically mention that he saw the gun when the death threat was made, it can certainly be gleaned a gun was used, since it had been already used once already to shoot the victim in the neck and paralyze him, and was found 20 feet from the ultimate location of the victim's car after the defendant fled the scene. Visual confirmation by the victim is not the only means to establish that a gun was used in the commission of the crime.

{¶136} Once it has been established that there was a distinct crime of felonious assault committed, there appears to be no question whether the felonious assault should merge with the aggravated robbery conviction; the charges should not merge. Although some elements of the two crimes overlap, the test for determining whether offenses are allied offenses of similar import is, first, to determine whether the elements of the crime (considered in the abstract) overlap to such a degree that the commission of one offense will necessarily result in the commission of the second offense; and second, if the offenses are allied, whether the crimes were committed separately or with separate animus. *State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, ¶16. The two crimes, here are not allied offenses, as each crime contains elements that are not part of the other crime. *State v. Bates* (Dec. 2, 1997), 10th Dist. No. 97APA02-171; *State v. Crawford* (1983), 10 Ohio App.3d 207, 461 N.E.2d 312, syllabus. Felonious assault occurs when a person knowingly causes or attempts to cause physical harm to another by means of a deadly weapon or dangerous ordnance. R.C. 2903.11(A)(2). Aggravated robbery occurs when a person, while attempting, committing, or fleeing from

a theft offense, has a deadly weapon on the offender's person or under the offender's control, and displays, brandishes, uses or indicates possession of the weapon. R.C. 2911.01(A)(1). Aggravated robbery does not need to be committed "knowingly," and felonious assault does not involve an attempted or actual theft offense. Thus, the overlap of the crimes is not sufficient for them to be allied offenses of similar import, and they may be punished separately.

**{¶137}** Because the evidence supports a separate crime of felonious assault, I would affirm the trial court's decision not to merge the attempted murder and the felonious assault convictions at sentencing. The eight-year prison term imposed for felonious assault should remain part of the sentence. I do agree with the majority that the kidnapping and aggravated robbery convictions should not have been merged, and that there was no reversible error regarding venue or joinder. I further agree with the majority that there is reversible error with respect to the gun specifications. All the crimes that occurred in this case were part of one continuous overall plan to rob the victim. Thus, there should have only been one penalty imposed for the gun specifications, even though Appellant was convicted of four gun specifications and consecutive three-year prison terms were imposed for each of the gun specifications. I would modify the sentence by reducing the gun specification penalty from 12 years to 3 years, thereby reducing the total penalty from 50 years in prison to 41 years in prison. I would find no need to remand this case for resentencing, because we have the authority to modify the sentencing error, accordingly.